THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HOWARD BERRY and DAVID BERRY, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

TRANSDEV SERVICES, INC. d/b/a VEOLIA TRANSPORTATION SERVICES INC., TRANSDEV NORTH AMERICA, INC. f/k/a VEOLIA SERVICES, INC., and FIRST TRANSIT, INC.,

Defendants.

Case No. C15-01299-RAJ

**ORDER ON PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

## I. INTRODUCTION

This matter comes before the Court on Plaintiffs' Motion for Class Certification. Dkt. # 95. Defendants oppose the Motion. Dkt. ## 135, 136. For the reasons stated below, the Court **DENIES** Plaintiffs' Motion.

## II. BACKGROUND

Plaintiffs, Howard Berry and David Berry, individually and on behalf of others similarly situated, filed suit against Defendants, Transdev Services, Inc., Transdev North America, Inc. (collectively "Transdev"), and First Transit, Inc. ("First Transit"). Dkt. # 88. Defendants jointly operate the paratransit service for the King County

ORDER-1

Accessible Services Division. *Id*. at ¶ 1.1. Plaintiffs claim that Defendants failed to provide their employees, drivers for the paratransit service, with rest and meal breaks in violation of Washington law and in violation of their contracts with King County. *Id*. at ¶ 1.4. Plaintiffs also claim that Transdev failed to compensate their drivers for all of the hours that they worked. *Id*. at ¶ 1.5.

King County provides paratransit services to persons with disabilities who are unable to use fixed route bus services. Dkt. # 135 at 2. King County contracts with First Transit and Transdev to implement its paratransit program. Dkt. # 96 Exs. 2, 4. Transdev, as Service Provider for King County's paratransit services, is responsible for hiring and providing the drivers for the paratransit program and maintaining the vehicles. Dkt. # 96 Ex. 2. First Transit, as the Control Center, is responsible for scheduling and dispatching those drivers. *Id*. Ex. 4. First Transit acts as the "point of public contact for ride screening, ride scheduling, and dispatch." *Id*. Ex. 4. While First Transit does not employ Transdev drivers, Plaintiffs allege that First Transit is a "joint employer" of all of the proposed class members under Washington law. *See Becerra v. Expert Janitorial, LLC*, 181 Wn.2d 186, 194 (2014).

Transdev's drivers are dispatched out of three terminals located in Bellevue, Kent, and Shoreline. Dkt. # 96 Ex. 8. Transdev has one operations manager at each terminal to oversee all of the drivers in that location. *Id*. Defendants' contracts require First Transit to use a computerized scheduling, dispatch, and information system called TRAPEZE, to develop schedules for vehicles and riders. *Id*. Exs. 2, 4 at § 4.1(B)(2). First Transit is also required to provide Transdev with trip schedules on a daily basis. *Id*. at § 4.1(B)(1). These trip schedules, also known as manifests, include the schedule and order of all of the pick-ups and drop-offs that First Transit schedules for each driver. Dkt. # 96 Ex. 8. While drivers bid on routes developed by First Transit three times a year, a driver's daily trip schedule is not a set schedule, and varies based on several factors. These factors include the number of rides requested, whether passengers move or cancel rides, and

when rides are moved between routes in order to keep them on time. Dkt. # 96 Exs. 2, 4 at §§ 4.5(A)(4)-(5), Ex. 5 at 52:15-53:3, Ex. 8. First Transit can also change the start time of a driver's shift the day before service to start an hour earlier or an hour later than the scheduled start time. Dkt. # 96 Ex. 5 at 52:15-53:3.

The parties dispute whether First Transit, Transdev, or King County is ultimately responsible for changes to a driver's schedule. *See* Dkt. # 95 at 7 ("With the exception of extending a driver's route beyond the driver's scheduled end time, First Transit does not need approval from Transdev to make any changes to a driver's schedule or route."); Dkt. # 135 at 3 (Transdev "has no control over scheduling and dispatching its drivers," and First Transit "has complete control over scheduling and dispatching drivers."); Dkt. # 136 at 4 (TRAPEZE settings are "jointly configured by King County, First Transit, and Transdev," and "TRAPEZE does much of the route scheduling on its own 'with minimal human intervention.'" First Transit was "unable to schedule rest breaks without permission from King County."); Dkt. # 136 at 5 (Transdev "window dispatchers" can move and reschedule rides in TRAPEZE and First Transit must obtain Transdev's permission before making route changes that affect driver work schedules.").

Each driver's vehicle is required to be equipped with a Mobile Data Terminal ("MDT"). Dkt. # 96 Exs. 2, 4 at § 4.1(B)(1)-(2). MDTs interface with TRAPEZE to display each driver's daily schedule. MDTs also update throughout the day with any schedule changes First Transit makes in TRAPEZE. Drivers input data into the MDTs when they arrive or depart a pick-up or drop-off location to allow First Transit to monitor a driver's timeliness and provide updates to passengers. Dkt. # 96 Ex. 5. MDTs also allow First Transit to communicate with drivers through a messaging program. *Id*. Each vehicle is also required to have a Nextel two-way radio to allow for "continuous communication" between First Transit, Transdev, and the drivers. *Id*. Exs. 2, 4 at § 6.1(D)(2).

Defendants' contracts with King County also reference Defendants' responsibility to ensure that the drivers are provided with periodic breaks and lunches several times, stating that they are "responsible for ensuring compliance with all applicable laws and regulations, including any that require that [their] employees be provided with periodic breaks during a work day," that they must work together to "develop a plan [that conforms to applicable law] to ensure driver breaks and lunches that shall have the least impact on the provision of service," and that First Transit is required to "ensure that its drivers receive breaks and lunches." Dkt. # 96 Exs. 2, 4 at §§ 4.5(A)(1), 6.5(D)(1), 6.5(D)(12).

King County requires that these paratransit services are "safe, reliable, and efficient," at all times. Dkt. # 96 Exs. 2, 4 at § 2.25. In relation to these goals, at the option of King County, liquidated damages may be assessed if Defendants' "on-time performance falls below 90% two (2) or more months in a row, or below 85% in any one month." Dkt. # 96 Exs. 2, 4 at § 2.25. Repeated failures to provide on-time performance may also be deemed a material breach of contract and cause for termination of that contract. *Id.* Drivers are monitored for on-time performance. Dkt. # 96 Exs. 8, 9. First Transit dispatchers' primary goal is to monitor and ensure on-time performance by the drivers. Dkt. # 96 Ex. 5. Drivers who fail to meet these performance requirements are counseled regarding ways to improve their on-time performance. Dkt. # 96 Exs. 8, 9. Transdev has not disciplined a driver for failing to meet on-time performance standards. Dkt. # 141 Ex. B at 93:24-94:6.

On December 27, 2011, Transdev's Director of Safety in King County distributed a posting regarding meal and rest periods to each base manager for posting. Dkt. # 139. The posting included text from WAC § 296-126-092 as well as instructions on what to do if a driver was not receiving meal or rest periods. *Id.* Ex. 1. Before March 1, 2015, rest breaks were not scheduled into routes or monitored for each driver. Prior to this date Transdev did not have an official written policy on rest breaks for the drivers. Dkt. # 96

Exs. 5, 8. Drivers were informed that they were entitled to rest breaks, however it was their responsibility to take those breaks. Dkt. # 96 Exs. 5, 8. To allow for these breaks, First Transit would build "slack" into each route where no passengers were in the vehicles, to give drivers time to take a break. *Id.* First Transit alleges that this "slack" is sufficient to allow drivers to take intermittent breaks totaling ten minutes for every four hours. Dkt. # 125 at 6. Plaintiffs allege that even with the new meal and rest period policy, drivers do not regularly receive their rest and meal breaks due to problematic scheduling. Dkt. # 96 Ex. 8. For example, Plaintiffs allege that First Transit regularly schedules the first break of a driver's shift to occur within the first ten minutes of the start of that shift or at the same time as the driver's lunch, or sets the second break of a driver's shift to occur at the end of the shift. Dkt. # 95 at 11, 12. This scheduling impedes the drivers' ability to take their rest breaks or causes drivers to work for too many hours without the break they are entitled to.

While rest breaks were not previously scheduled into a driver's shift, meal breaks have been scheduled in each driver's daily schedule for the entire period at issue. Dkt. # 96 Ex. 5; Dkt. # 141 Ex. A. Drivers receive notice of their scheduled meal break as a line item on their daily schedule and MDTs. *Id.* First Transit schedules meal breaks to begin three to five hours from the shift start time, and cushions the meal break with additional time for drivers to find a parking spot. *Id.* Each driver's daily schedule, or manifest, has a manifest cover sheet that includes a space for drivers to note missed meal breaks and the reason for the missed break. Dkt. # 141 Exs. E, L. Drivers are also instructed to contact dispatchers or managers if they have issues with their meal breaks. Dkt. # 96 Ex. 11. Despite the scheduling, Plaintiffs allege that drivers have complained that they do not receive their meal breaks. Dkt. # 95 at 13.

In January of 2016, Transdev changed the manifest cover sheet to include a box for drivers to check if they did not receive their rest breaks. Dkt. # 138; Dkt. # 141 Ex. B. If a driver checks the box, Transdev represents that the drivers are paid for the

ORDER-5

missed break. *Id*. Exs. 9-11. Prior to this change in the manifest cover sheet, Transdev provided a space for each driver to note the times they started and stopped each rest break, but did not have other official methods for drivers to record missed rest breaks. Dkt. # 141 Ex. E. On February 3, 2016, Transdev also distributed a more detailed policy regarding rest breaks. *Id*. Ex. 30.

On July 14, 2015, Plaintiffs filed this lawsuit in King County Superior Court. Dkt. # 1. The case was then removed to this District on August 14, 2015. *Id*. Plaintiffs subsequently filed three amended complaints. Dkt. ## 22, 76, 88. On April 14, 2017, the Court issued an Order denying First Transit's Motion to Dismiss and granting in part and denying in part First Transit's Motion to Dismiss Transdev's cross-claim. Dkt. # 48. Plaintiffs then filed this Motion for Class Certification on June 25, 2018. Dkt. # 95.

### III. LEGAL STANDARD

The Court's decision to certify a class is discretionary. *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009). Federal Rule of Civil Procedure 23 ("Rule 23") guides the Court's exercise of discretion. A plaintiff "bears the burden of demonstrating that he has met each of the four requirements of Rule 23(a) and at least one of the [three alternative] requirements of Rule 23(b)." *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 724 (9th Cir. 2007). Rule 23(a) requires a plaintiff to demonstrate that the proposed class is sufficiently numerous, that it presents common issues of fact or law, that it will be led by one or more class representatives with claims typical of the class, and that the class representative will adequately represent the class. *Gen. Tel. Co. of the S.W. v. Falcon*, 457 U.S. 147, 161 (1982); Fed. R. Civ. P. 23(a).

If a plaintiff satisfies the Rule 23(a) requirements, he must also show that the proposed class action meets one of the three requirements of Rule 23(b). *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). Here, Plaintiffs move for class certification under Rule 23(b)(3). A class may be certified under this subdivision if: (1) common questions of law and fact predominate over questions

affecting individual members, and (2) if a class action is superior to other means to adjudicate the controversy. Fed. R. Civ. P. 23(b)(3). The "predominance" and "superiority" prongs of Rule 23 work together to ensure that certifying a class "would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (internal citation and quotation omitted). A "central concern of the Rule 23(b)(3) predominance test is whether 'adjudication of common issues will help achieve judicial economy.'" *Vinole*, at 944 (quoting *Zinser*, 253 F.3d at 1189). Thus, the Court must determine whether resolution of common questions would resolve a "significant aspect" of the class members' claims such that there is "clear justification" for class treatment. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (citations omitted).

In considering Rule 23's requirements, the Court must engage in a "rigorous analysis," but a "rigorous analysis does not always result in a lengthy explanation or in depth review of the record." *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 961 (9th Cir. 2005) (citing *Falcon*, 457 U.S. at 161). The Court is neither permitted nor required to conduct a "preliminary inquiry into the merits" of the plaintiff's claims. *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975) (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974)); *see also* Fed. R. Civ. P. 23 advisory committee's note (2003) ("[A]n evaluation of the probable outcome on the merits is not properly part of the certification decision."); *but see Dukes*, 564 U.S. at 351 (suggesting that Rule 23 analysis may be inextricable from some judgments on the merits in a particular case). The Court may assume the truth of a plaintiff's substantive allegations, but may require more than bare allegations to determine whether a plaintiff has satisfied the requirements of Rule 23. *See*, *e.g.*, *Blackie*, 524 F.2d at 901, n.17; *Clark v. Watchie*, 513 F.2d 994, 1000 (9th Cir. 1975) ("If the trial judge has made findings as to the provisions of the Rule and their

application to the case, his determination of class status should be considered within his discretion.").

## IV. DISCUSSION

Plaintiffs move that the Court certify a class under the following definition:

> All persons who, at any time between July 14, 2009 and the date of final disposition of this action, worked as drivers for a King County paratransit service operated by Transdev as the service provider and First Transit as the control center.

Dkt. # 88 at ¶ 4.1. Plaintiffs allege that the proposed class consists of more than 600 current and former paratransit drivers. Dkt. # 95 at 22. Defendants do not dispute that Plaintiffs' proposed class meets the requirement of numerosity.

### A. Rule 23(a)

Rule 23(a)(2) requires "a common contention . . . of such a nature that it is capable of classwide resolution." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). "A contention is common to all members if 'determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Civil Rights Educ. & Enf't Ctr. v. Hosp. Properties Tr.*, 867 F.3d 1093, 1103 (9th Cir. 2017) (quoting *Dukes*, 564 U.S. at 350). "[T]he key inquiry is not whether the plaintiffs have raised common questions, but rather, whether class treatment will generate common *answers* apt to drive the resolution of the litigation." *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (internal quotation marks omitted). Commonality cannot be determined without a precise understanding of the nature of the underlying claims. *Parsons v. Ryan*, 754 F.3d 657, 676 (9th Cir. 2014).

Plaintiffs list several factual and legal issues that they allege arise out of Defendants' "systemic practice of wage and hour abuses," and that they contend satisfy the commonality requirement of class certification. Among these issues are whether First

Transit is a "joint employer" of Plaintiffs and the proposed class members, whether Plaintiffs are third-party beneficiaries to the service contracts between King County and Defendants, and whether Plaintiffs were injured by any breach of those contracts by each Defendant. The Court disagrees that these issues would resolve issues central to the validity of each of Plaintiffs' claims. At most these questions answer whether First Transit can be liable for these alleged violations of Washington law, whether Plaintiffs can bring a breach of contract action against Defendants, and if Plaintiffs' are third-party beneficiaries to the relevant service contracts, whether Plaintiffs were injured by any alleged breach by each Defendant. While these issues are all tangentially related, Plaintiffs base their claims on the paratransit drivers' alleged missed rest and meal breaks. The above "common questions" do not arise out of Defendants' alleged policy of preventing drivers from taking their meal and rest breaks.

Plaintiffs also contend that there is a common issue of whether Defendants have a "uniform policy and practice" of failing to provide drivers with rest breaks and ensuring that drivers take the rest and meal breaks to which they are entitled. Whether Defendants do have a common policy or practice of failing to meet their obligations regarding rest and meal breaks under Washington law, is a question that is central to all of Plaintiffs' claims. Setting aside Plaintiffs' contentions regarding First Transit's status as a joint employer and Plaintiffs' status as third-party beneficiaries to Defendants' service contracts, the existence of such a policy or practice is an underlying issue for all of Plaintiff's claims. While the answer to this common question would drive the resolution of this litigation, consideration of the evidence presented and the nature of Plaintiffs' claims make clear that this common issue does not predominate over questions affecting individual class members and thus, does not meet the requirements of Rule 23(b).

### B. Rule 23(b)

#### a. Predominance

A plaintiff "bears the burden of demonstrating that he has met each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)." *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 724 (9th Cir. 2007). Pursuant to Rule 23(b)(3), a class may be certified under this subdivision if common questions of law and fact predominate over questions affecting individual members. Fed. R. Civ. P. 23(b)(3). To meet the predominance requirement, common questions of law and fact must be "a significant aspect of the case . . . [that] can be resolved for all members of the class in a single adjudication." *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 589 (9th Cir. 2012) (quoting *Hanlon*, 150 F.3d at 1022). To make this determination, the Court must analyze the elements of the underlying cause of action. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).

Washington law places an affirmative obligation on employers to provide employees with rest and meal breaks, and to ensure that those breaks comply with WAC 296–126–092. *See Pellino v. Brink's Inc.*, 164 Wash. App. 668, 688, 267 P.3d 383, 395 (2011). "[A]n employee asserting a meal break violation under WAC 296-126-092 can meet his or her prima facie case by providing evidence that he or she did not receive a timely meal break. The employer may then rebut this by showing that in fact no violation occurred or a valid waiver exists." *Brady v. Autozone Stores, Inc.*, 188 Wash. 2d 576, 584, 397 P.3d 120, 124 (2017). Washington law requires employers "to schedule breaks at regular intervals unless the 'nature of the work' allows employees to take intermittent rest periods." *Chavez v. Our Lady of Lourdes Hosp. at Pasco*, 190 Wash. 2d 507, 517–18, 415 P.3d 224, 230–31 (2018); WAC 296-126-092(4), (5); *see Lopez Demetrio v. Sakuma Bros. Farms, Inc.*, 183 Wash.2d 649, 658, 355 P.3d 258 (2015) ("It is not enough for an employer to simply schedule time throughout the day during which an employee can take a break if he or she chooses. Instead, employers must affirmatively promote

meaningful break time. A workplace culture that encourages employees to skip breaks violates WAC 296-126-092 because it deprives employees of the benefit of a rest break 'on the employer's time.'")

Despite Plaintiffs' contention, it is unclear whether Defendants engaged in a common policy or practice of failing to provide drivers with rest and meal breaks, as their policies changed several times during the relevant period. Except for a posting at each King County terminal, until March of 2015, Transdev did not have a written policy regarding meal and rest breaks. Prior to that time, First Transit scheduled meal breaks but did not schedule rest breaks for drivers. Even after the new policy was implemented, breaks were not scheduled in a uniform manner until September of 2015. Dkt. # 96 Ex. 5. Transdev also represents that on February 3, 2016, they distributed another, more detailed policy regarding rest breaks. Not all of the potential class members were subject to the same policies at the same time, and if one particular policy is found to be in violation of Washington law, determining either Defendant's liability would require an individualized inquiry as to each driver's experience and time of employment.

To the extent that Plaintiffs allege that Defendants' "common course of conduct" is just a general failure to ensure that drivers received rest and meal breaks, this contention is also problematic. Plaintiffs make many separate arguments regarding Defendants' conduct in relation to the drivers' rest and meal breaks. The number of different arguments based on time (Defendants' actions before the 2015 policy and after the 2015 policy), type of break (rest breaks and meal breaks), reasons for lack of breaks (denial of permission to take breaks or lack of "slack" time), and issues of liability (i.e. whether First Transit can be considered a joint employer), serve to emphasize that individualized issues predominate over this common contention. Plaintiffs contend that drivers do not receive proper meal breaks, but do not show that Defendants had a common practice of failing to provide these meal breaks in a timely fashion. Plaintiffs offer several declarations from proposed class members that support a finding that these

specific individuals do not always receive full meal breaks, but do not point to any common policy or practice implemented by Defendants that creates that situation. Anecdotal evidence regarding missed or incomplete meal breaks is not sufficient to establish the existence of a common practice. Plaintiffs refer several times to Defendants' "uniform policies and practices" and the results of those alleged policies but do not explain what those policies were or how they failed to ensure that drivers received proper meal breaks.

Plaintiffs' claims regarding Defendants' policies related to rest breaks would also necessitate individualized inquiries. Prior to March of 2015, Defendants allege that the "slack" built into the drivers' daily schedules provided drivers with the time required to take intermittent rest breaks. Plaintiffs allege that Transdev's policies related to "slack" time do not allow drivers to use this time to take breaks because they must ask for authorization to leave their vehicle and because they must arrive at the opening of their "pick-up window." Plaintiffs make separate arguments regarding First Transit's policies, stating that First Transit's instruction to add trips to routes with "slack" time impeded drivers' ability to take breaks. Determining whether an individual driver's ability to take rest breaks was impeded by these policies requires inquiry as to whether a driver was able to take a break, whether the break was intermittent, and whether a driver's ability to take a break was impeded by the inability to obtain authorization or the addition of a route. Consideration of "slack" time in relation to rest breaks would also need to take into account the many other variables that may affect the amount of available "slack" time in a driver's daily schedule, i.e. the number of available drivers, the number of rides per route, traffic conditions, etc.

The relevant issues underlying Plaintiffs' rest break claims change after 2015. After a new policy was implemented, First Transit began officially scheduling rest breaks. Plaintiffs contend that after First Transit began scheduling rest breaks, they engaged in a common policy of scheduling them in a manner that required drivers to

work more than three consecutive hours without a rest break. Dkt. # 154 at 7. As with Plaintiffs' arguments regarding meal breaks, Plaintiffs only offer anecdotal evidence to support their contention that First Transit had a common practice of failing to schedule rest breaks that comply with Washington law. Even if Plaintiffs could support their contention with information from drivers' MDTs and TRAPEZE, this information would only be relevant to help establish a common practice regarding rest breaks after 2015.

Plaintiffs' uncompensated work claims are similarly not appropriate for certification because Plaintiffs have not shown that Transdev has a practice of failing to pay the proposed class members for all of the hours that they worked. Plaintiffs' uncompensated work claim is based on time records from the biometric time clock that the drivers use to clock-in and clock-out for their shift. Plaintiffs assert that Transdev does not permit drivers to clock-in more than five minutes before the start of their shifts and requires them to clock out no later than five minutes after arriving at the Transdev terminal at the end of a shift. Dkt. # 95 at 19. As with Plaintiffs' meal break claims, Plaintiffs base this assertion on declarations from individual drivers as well as individual payroll records. There is little to support a finding that this is an actual Transdev policy and not the experience of individual drivers. While the parties dispute the significance of the recorded clock-in and clock-out times as well as Plaintiffs' interpretation of each driver's payroll record, the Court will not resolve those factual disputes here. For purposes of this Motion, it is enough to note that it is not clear that Transdev has a common practice of failing to pay the proposed class members for all of the hours that they work. Based on the evidence presented, assessment of Plaintiffs' claims would require an individualized inquiry as to whether each driver begins work as soon as they clock-in, what types of actions constitute compensable work, and in some cases, a comparison of the drivers' manifest cover sheets to the relevant time records to assess whether each driver was paid for all time worked. Therefore, Plaintiffs do not meet their

burden to show that the requirement of predominance is met for their uncompensated work claim.

Finally, Plaintiffs argue that their possible status as third-party beneficiaries to Defendants' service contracts with King County is a common issue that can be resolved for the entire class. While the Court agrees with Plaintiff's assessment, whether Defendants breached these contracts are again, subject to individualized inquiry. To prove that Defendants failed to comply with their service contracts, Plaintiffs will have to show that Defendants failed to provide meal and rest breaks in compliance with applicable law. As noted above, the common issue of whether Plaintiffs are third-party beneficiaries does not predominate over the many questions affecting individual class members when considering the claims underlying this alleged breach of contract.

    b. <u>Superiority</u>

The Court must next consider whether the class is superior to individual suits. *Amchem*, 521 U.S. at 615. "A class action is the superior method for managing litigation if no realistic alternative exists." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234-35 (9th Cir. 1996). This superiority inquiry requires a comparative evaluation of alternative mechanisms of dispute resolution. *Hanlon*, 150 F.3d at 1023. Rule 23(b)(3) provides a non-exhaustive list of factors relevant to the superiority analysis. Fed. R. Civ. P. 23(b)(3).

The Court finds that this class action would be unmanageable given the predominance of the individual issues necessary to establish either Trandev's or First Transit's liability. The resources that would be expended on litigating the separate issues underlying each class member's right to recover would far exceed those saved by classwide determination of the common issues present in this case. Further, Plaintiffs' brief comment that it is likely that most proposed class members lack the resources necessary to seek individual redress for Defendants' misconduct is not persuasive without more explanation or argument. The difficulties in managing such a wide-ranging factual

ORDER-14

inquiry persuade the Court that class treatment is not a superior method for resolution of the class members' potential claims. Accordingly, the Court finds that class treatment is not superior to individual suits as a means to adjudicate this dispute.

## V. CONCLUSION

Based on the foregoing, the Court **DENIES** Plaintiffs' Motion for Class Certification. Dkt. # 95.

Dated this 7th day of January, 2019.

The Honorable Richard A. Jones
United States District Judge

ORDER-15